**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | **CRIMINAL NO.   19-84** |
| | ) | |
| v. | ) | |
| **DEVONTAY MONTAZE GREEN,** | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

CONTI, Senior District Judge.

**I.      Introduction**

Defendant Devontay Green ("Green") filed a motion (ECF No. 66) seeking to suppress evidence asserting that: (1) the initial stop of the automobile in which he was a passenger was not supported by probable cause or reasonable suspicion; and (2) his waiver of his right to remain silent was not knowing and voluntary.  The government filed a response in opposition to the motion (ECF No. 68).

On July 20, 2021, the court held an evidentiary hearing.  (Transcript, ECF No. 77). Pittsburgh police officer Sean Rattigan ("Rattigan"), FBI agents John Orlando ("Orlando") and John Balish ("Balish"), and Green testified.  The following government exhibits were admitted into evidence: Ex. 1 (a dashcam video of the automobile stop); Ex. 2 (FBI Advice of Rights form); Ex. 3 (Consent to search cell phone form); and Ex. 4 (FBI Report).  There were no defense exhibits.  The parties were permitted to file simultaneous post-hearing proposed findings of fact and conclusions of law.  After several requests for extensions of time by counsel for Green, the government filed its post-hearing submissions on November 5, 2021 and defense counsel filed proposed findings of fact and conclusions of law on January 27, 2022.  (ECF Nos.

78, 81).  The motion is ripe for disposition.

**II.     Factual and Procedural Background**

      Green is charged in count 1 of the indictment at Criminal Number 19-84 with knowingly, intentionally and unlawfully distributing a quantity of heroin and fentanyl on or about October 30, 2018, resulting in serious bodily injury and death of a person known to the grand jury, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  Count 2 of the indictment charges him with possession with intent to distribute a quantity of heroin and fentanyl on November 1, 2018, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

**III.    Findings of Fact**

      **A.  Background**

1.  The Western Pennsylvania Opioid Task Force was investigating an opioid overdose death that occurred on October 31, 2018.  Tr. 9.   A confidential source ("CS") told officers where the victim and the CS purchased their narcotics.  Tr. 29.

2.  On November 1, 2018, officers used the CS to perform a controlled purchase of heroin. Officers were able to identify Green as the supplier.  Tr. 8, 29-30.

3.  The controlled purchase took place from a silver Lincoln MKZ vehicle (the "silver Lincoln") at approximately 5:00 p.m.  Tr. 9.  The CS reported that Green handed drugs to the CS.  Tr. 20.

4.  Rattigan and Orlando were part of the team conducting surveillance of the area.  Rattigan did not personally observe the controlled purchase transaction.  Tr. 9.

5.  Approximately 15 minutes after the controlled purchase, officers observed Green enter the passenger seat of the silver Lincoln.  Tr. 20.  The driver was later determined to be Teon West ("West").  Tr. 15.

6.  Rattigan followed the vehicle to a narrow street in the Beltzhoover neighborhood of

Pittsburgh, Pennsylvania, a known drug supply area.  The surveillance cars could not follow.

Tr. 10.

7.  The officers believed that Green was replenishing his heroin supply after the controlled

purchase by the CS.  Tr. 11.

**B.  The Initial Encounter**

8.  Rattigan's vehicle was directly behind the silver Lincoln as it left the Beltzhoover location at

approximately 5:30 p.m.  The windows of both vehicles were partly open.  Rattigan testified

he observed smoke coming out the window of the silver Lincoln and when the vehicles

stopped at a traffic light, Rattigan smelled the odor of marijuana coming from the silver

Lincoln.  Tr. 11, 26.

9.  No marijuana was reported after the vehicle search.  Green did not appear to be under the

influence of drugs or alcohol during the interview at the FBI building later that evening.  Tr.

69.[1]

10.  After believing he observed marijuana, Rattigan consulted other task force officers and

decided to conduct a traffic stop.  Tr. 12, 18.

11.  Because Rattigan's vehicle was undercover and did not have lights or sirens, he contacted

dispatch to have a marked unit conduct the traffic stop.  Tr. 12.

12.  A marked unit responded and attempted to stop the silver Lincoln on Route 51.  West

initially pulled over.  When the officers got out of the patrol car, however, the silver Lincoln

sped off.  Tr. 13; Ex. 1.

13.  The dispatch supervisor initially advised officers to let the vehicle go if the stop was just for

_____

[1] Green testified that neither West nor he was smoking marijuana.  Tr. 80.  Orlando did not meet with West.  Tr. 57.

marijuana, but after Rattigan explained they were investigating a drug overdose death, pursuit was authorized.  Tr. 13; Ex. 1.

14. The silver Lincoln crashed into another vehicle shortly thereafter.  West jumped from the car and fled.  Officers, including Rattigan, pursued West on foot.  Tr. 13.

15. Other officers saw bricks of heroin in plain view on the driver's side floorboard of the silver Lincoln.  Tr. 25.  Officers also recovered three cell phones from the silver Lincoln.  Tr. 38; Ex. 4.

16. Green admitted being a passenger in the vehicle.  Tr. 80. After the crash, Green hid under a nearby vehicle for a couple minutes and attempted to walk away.  Tr. 45.

17. Orlando was conducting surveillance of the controlled purchase and subsequent vehicle chase.  Orlando recognized Green as the person involved in the controlled purchase with the CS earlier that day and detained him.  Tr. 31, 45.

18. Green was handcuffed, placed in a marked Pittsburgh police unit, and transported to the FBI building.  Tr. 46.

### C.  The Rattigan Report

19. Because the heroin was found on the driver's side of the vehicle, charges were initially filed in state court against West.[2]  Rattigan prepared a report in connection with the arrest of West.

20. Rattigan testified that in his report, he noted that Green was not cooperating with officers: "Q: Now, in that report, you stated that the defendant was not cooperating?  A: That's correct."  Tr. 17.  Rattigan's report was not introduced or admitted into evidence.

21. Rattigan explained that Green was taken to the FBI office, and Rattigan's report was prepared at the City of Pittsburgh narcotics office and finished before he learned that Green

---

[2] The charges against West were withdrawn when Green admitted later that evening the drugs belonged to him.  Tr. 24.

made statements to the FBI agents.  Tr. 17.  Rattigan had no first-hand knowledge about whether Green cooperated with the FBI agents.  Rattigan did not know who provided the statement he placed in his report.  Tr. 23.

### D.  The FBI Building

22. Green was placed in an interview room at the FBI building and remained in handcuffs.  Tr. 47-48.

23. Green testified that Balish was alone in the FBI interview room with him for 30-45 minutes, without being recorded and without advising him of his rights.  Tr. 82.

24. Green testified that he asked at least five times whether he was going to jail or home, but Balish brushed those questions off.  Tr. 83.

25. Green admitted he never asked for an attorney, but testified he asked to make a phone call. Balish kept saying to wait for Orlando.  Tr. 88.

26. Orlando was the lead interviewer.  Tr. 31.  Balish remained in the room to witness the interview and Green's waiver of rights.  Tr. 31-32.

27. Pursuant to standard procedure, at the beginning of the interview, Orlando turned on the recorder.  Green did not want to be recorded, so Orlando shut it off.  Tr. 33.

28. Orlando explained that cooperating witnesses are frequently uncomfortable with having the interview recorded.  Tr. 67.

### E.  Green's written waiver of his *Miranda* rights

29. Orlando provided Green with the standard FBI "advice of rights" form and read it to him verbatim.  The form discusses, among other things, the right to remain silent, the right to talk to a lawyer, and the right to stop answering questions at any time.  Tr. 34; Ex. 2.

30. Green verbally indicated that he understood his rights and was willing to talk.  Green did not express any questions or concerns.  Tr. 34-36.

31. The consent portion of the form states:  "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Ex. 2.

32. Green signed the form at 7:28 p.m. on November 1, 2018.  Orlando and Balish witnessed his signature.  Ex. 2.

33. Green was given the Advice of Rights form and told the agents that he understood his rights.  Tr. 86-87.

**F.  The Interview**

34. After Green executed the Advice of Rights form, the agents began to question him.

35. All the statements Green seeks to suppress in his pending motion were made after Green signed the Advice of Rights form.  Tr. 68, 74.

36. Orlando described Green's demeanor as calm and without anger or tension.  Tr. 69.

37. Balish testified that Green was not agitated or combative and that Green never invoked his right to silence or right to speak to an attorney.  Tr. 74-75.

38. When Green asked Orlando to make a phone call, Orlando said no.  Green never told the agents who he wanted to call.  Tr. 88-89.

39. Orlando began questioning Green in the FBI building interview room.  After 10 to 15 minutes, Green asked whether there was another place to talk.  The agents took him to an unmarked minivan in the FBI parking lot.  Orlando sat in the driver's seat and Green sat in one of the back seats.  Balish was also present.  Green was not handcuffed in the minivan.  Tr. 36-37.

40. Orlando and Green engaged in an open discussion.  Green never invoked his right to silence and never requested an attorney.  Green never appeared scared or threatened.  Tr. 42-43.

41. Orlando and Green spoke about the situation Green faced.  At that time, Green was not formally charged.  Tr. 46.

42. Orlando presented options: if Green cooperated, he could go home; otherwise, he would go to jail.  Tr. 47, 53.

43. The questions were not all leading; some were open-ended, because Orlando wanted to obtain information from Green.  Tr. 55-56.

44. Orlando testified that Green made numerous incriminating statements, including admitting distributing heroin earlier that day and that the drugs recovered from the silver Lincoln belonged to him. Tr. 38.  Green denies making these statements.  Tr. 90-91.[3]

45. Green admitted that one of the cell phones recovered from the silver Lincoln belonged to him.  Tr. 38.

46. While in the van, Green consented to a search of his cell phone and signed a consent to search form.  Orlando and Balish witnessed his signature.  Tr. 39; Ex. 3.

47. Green admitted that he voluntarily consented to the search and download of his cell phone.  Tr. 94.

48. The interview in the van lasted approximately 30-45 minutes, although much of that time was required to perform a data extraction from the cell phone.  Tr. 53-54.

49. The cell phone was returned to Green.  At the conclusion of the interview the agents drove Green, at his request, to the vicinity of Beck's Run Road and Brownsville Road to meet his girlfriend.  She was pregnant at that time.  Tr. 40-41, 94.

---

[3] The court will not evaluate the credibility of this testimony because it is not necessary to resolve the pending motion to suppress evidence.

50. The total time from the crash until Green was dropped off to meet his girlfriend was approximately 3 hours.  Tr. 44.

51. On November 2, 2018, Orlando prepared a report of the incident (Ex. 4).

52. Green never invoked his right to remain silent or his right to have an attorney present.

53. Green agreed to speak with the FBI agents.

## IV.   Conclusions of Law

1. In his original motion, counsel for Green cursorily argued that the initial arrest was not supported by reasonable suspicion or probable cause and that all subsequent searches are "fruit of the poisonous tree."  Green also contended that his waiver of his right to remain silent was not knowing and voluntary.  In his post-hearing submission, Green contends: (1) there was no reasonable suspicion for the initial traffic stop; (2) Green invoked his right to silence, such that any further interrogation was prohibited; and (3) the totality of the circumstances demonstrate that his statements were coerced (ECF No. 81).  The court will address each of these contentions.

2. The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

3. The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

4. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherent pressure of custodial interrogation in an unfamiliar, police-dominated atmosphere. *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citing *Miranda*, 384 U.S. at 456-57)).

5. To counteract that pressure, "police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Shatzer*, 559 U.S. at 103 (citing *Miranda*, 384 U.S. at 444)).

6. The burden of proof is initially on the defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). After the defendant establishes a basis for his motion (for example, by asserting that it occurred without a warrant), the burden shifts to the government. *Id.*

7. Warrantless searches and seizures are presumptively unreasonable unless an exception applies. *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018). One such exception is that a police officer may conduct a brief, investigatory stop (i.e., a "*Terry* stop") when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

### A. Reasonable Suspicion

8. The government has the initial burden to prove by a preponderance of the evidence that a traffic stop is based on reasonable suspicion. *Wardlow*, 528 U.S. at 123; *United States v. Giles*, No. 1:07-CR-0192-01, 2008 WL 282369, at *7 (M.D. Pa. Jan. 31, 2008).

9. Green, as a passenger in the vehicle, has standing to challenge the stop. *Brendlin v. California*, 551 U.S. 249, 257-59 (2007) (passenger of an automobile that was pulled over by the police for a traffic stop was entitled to challenge constitutionality of that stop).

10. Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–

18 (1981).  Courts must "afford significant deference to a law enforcement officer's

determination of reasonable suspicion." *United States v. Torres*, 961 F.3d 618, 623 (3d Cir.

2020).

11. The reasonable suspicion standard applies equally to routine traffic stops.  *United States v.*

*Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).

12. Reasonable suspicion can be based on an officer's reasonable, but incorrect, observations.

*Delfin-Colina,* 464 F.3d at 398 ("an officer need not be factually accurate in her belief that

a traffic law had been violated but, instead, need only produce facts establishing that she

reasonably believed that a violation had taken place.").

13. The "reasonable suspicion" requirement is triggered only if there is a seizure.  *Hester*, 910

F.3d at 84; *accord United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("there can

be no Fourth Amendment violation until a seizure occurs.").

14. In the context of a vehicle pursuit, a seizure does not occur when police sirens are

activated, during the chase of the suspect's vehicle, or if the suspect pulls over briefly but

speeds away when officers draw near; the seizure occurs when the suspect eventually

surrenders at the conclusion of the chase.  *United States v. Stanton*, No. CRIM. 11-57, 2012

WL 4815402, at *4 (W.D. Pa. Oct. 10, 2012).

15. An allegedly "illegal pursuit" does not implicate the Fourth Amendment.  *Id.* at *3, 5

(citing *California v. Hodari D*, 499 U.S. 621, 624 n.1 (1991) (rejecting the argument that if

the officers initially approached the defendant's vehicle illegally, any contraband shed

during the ensuing pursuit would be inadmissible as fruit of the poisonous tree).

16. Green does not specifically contend that he was seized when the silver Lincoln briefly

pulled over to the curb, before speeding off again when officers exited the police car.  Any

such argument would be without merit.  *See Valentine*, 232 F.3d at 359 (citing *United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994), for the proposition that the defendant "was not seized when he stopped his car at the curb in response to police commands, but then sped away when the officer approached on foot."); *Stanton*, 2012 WL 4815402, at *4.

17. In this case, the occupants of the silver Lincoln never submitted to the officers' assertion of authority for more than a moment.  Although the vehicle pulled over briefly, it sped off again when the officers exited the patrol car.

18. Green was not seized until after the Lincoln crashed and Green hid under a nearby car and tried to exit the area, but was recognized and detained by Orlando.

19. At the time Green was seized, there was reasonable suspicion to conduct a traffic stop of the silver Lincoln on three independent grounds:  (a) the attempted flight of the silver Lincoln; (b) the officers' knowledge about the controlled purchase of heroin from Green by the CS and their reasonable suspicion that Green was replenishing his heroin supply; and (c) the observations of marijuana smoke and odor.

20. First, the vehicle's flight after being pulled over gave the officers reasonable suspicion to pursue it.  *Valentine*, 232 F.3d at 356 (in *Wardlow*, the Supreme Court held that "headlong flight from the police in a high-crime area provides reasonable suspicion, despite the fact that flight is not by itself illegal and could have completely lawful and rational explanations.").

21. The officers had a reasonable belief that the vehicle's flight after being pulled over by the marked police car violated Pennsylvania law.  *See* 75 Pa. Const. Stat. Ann. § 3733(a) ("Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop,

or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2).").

22. Second, the officers independently had reasonable suspicion to stop the silver Lincoln because there were objective, particularized facts to support a belief that the vehicle contained illegal drugs.  The officers surveilled a controlled sale of heroin by Green to the CS from the silver Lincoln; and 15 minutes later, Green traveled in the silver Lincoln to a known drug supply street in Beltzhoover.  The officers reasonably suspected that he replenished his supply of drugs.

23. Third, Rattigan had a reasonable suspicion, based on what he believed to be marijuana smoke and odor, that the operator of the silver Lincoln was driving under the influence. *United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018) ("It is well settled that the smell of marijuana alone ... may establish not merely reasonable suspicion, but probable cause.") (quoting *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)).  Even though no marijuana was found, Rattigan's observations were credible and supported a reasonable suspicion to stop the silver Lincoln.  *Id.* at 186 ("While the fact that no marijuana was found on April 4 is certainly a relevant consideration, it does not preclude our—or [the officer's]—consideration of this evidence in support of reasonable suspicion").

24. In sum, there was reasonable suspicion on three independent grounds:  (a) the silver Lincoln's attempted flight; (b) the officers' knowledge about the controlled purchase of heroin from Green by the CS and their reasonable suspicion that Green was replenishing his heroin supply; and (c) the observations of marijuana smoke and odor.

25. When officers observed heroin in plain view in the silver Lincoln, there was probable cause to take Green into custody. *Karnes v. Skrutski*, 62 F.3d 485, 499 (3d Cir. 1995) ("The presence of drugs in plain view in an automobile creates probable cause to search"); *United States v. Dukes*, 387 F. App'x 196, 199 (3d Cir. 2010) (observing drugs in plain view gave probable cause to arrest defendant). Even if drugs in the vehicle belonged to West, possession can be sole or joint and actual or constructive and Green could be charged with conspiracy. *See United States v. Perrin*, No. 2:14-CR-205-2, 2019 WL 3997418, at *4 (W.D. Pa. Aug. 23, 2019).

26. Green's Fourth Amendment rights were not violated and his motion to suppress evidence will not be granted on that basis.


### B. *Miranda* **Rights**

27. Green contends (albeit without citation to authority or the record) that he invoked his right to silence when he initially refused to give a statement and that any further attempts to interrogate him were unconstitutional (ECF No. 81 ¶¶ 8, 29-31).

28. The invocation of *Miranda* rights requires an unambiguous invocation of a person's right to remain silent. *Baylor v. Att'y Gen. of New Jersey*, No. CV 17-1435 (KM), 2020 WL 604015, at *6 (D.N.J. Feb. 5, 2020) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) ("If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong.").

29. If a suspect makes a reference that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect "*might*" be

invoking *Miranda* rights, officers are not required to cease questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis in original).

30. A request to remain silent is unambiguous when the defendant states that he wants to remain silent or that he does not want to talk with the police. *Evans v. Phelps*, No. CIV.A. 10-92-LPS, 2012 WL 1134482, at *9 (D. Del. Apr. 2, 2012) (citing *Berghuis*).

31. In *Berghuis*, the Supreme Court recognized that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis*, 560 U.S. at 381.

32. In the context of the right to counsel, the Supreme Court reiterated that the principle that it is impermissible for authorities to reinterrogate an accused in custody, *see Edwards v. Arizona*, 451 U.S. 477, 485 (1981), applies only if the accused has "*clearly asserted"* his right to counsel. *Davis*, 512 U.S. at 459 (emphasis added in *Davis*).

33. The Supreme Court explained:

> Although a suspect need not "speak with the discrimination of an Oxford don," post, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* at 459 (1994).

34. *Davis* involved invocation of a right to counsel, but as noted, those same standards apply to the invocation of the right to remain silent. *Berghuis*, 560 U.S. at 381.

35. The burden of persuasion on the discrete issue whether defendant clearly invoked his *Miranda* rights is on the defendant. *United States v. Colon*, No. CRIM. A. 98-587-5, 2000 WL 388728, at *5 n.2 (E.D. Pa. Apr. 14, 2000), aff'd, 45 F. App'x 88 (3d Cir. 2002) (citing

*Davis*, 512 U.S. at 459); *accord Koras v. Robinson*, 123 F. App'x 207, 212 (6th Cir. 2005) ("The Supreme Court's decision in *Davis* indicates the burden is on the defendant to prove that he clearly invoked his right to counsel in the first instance.").

36. The only evidence Green points to is a statement in Rattigan's police report (which was not admitted into evidence) to the effect that Green refused to cooperate.  Tr. 17.  Green's reliance on that purported statement is misplaced and unpersuasive.  Rattigan did not remember who told him about Green's refusal and his report was completed before Green's interview with Orlando and Balish concluded.  In addition, an alleged lack of cooperation is not the same as an invocation of *Miranda* rights.

37. During the suppression hearing, Green testified that he never asked for an attorney at any point in time.  Tr. 87.

38. During the suppression hearing, Green acknowledged that he did not specifically invoke his right to remain silent; instead, he asked to go home.  Tr. 103 ("I wouldn't say "invoke," but I continuously asked to go home.").

39. Green testified that at some point in time he was asked about whose drugs were in the silver Lincoln and he responded to the officers' question, albeit by denying knowledge about whose drugs were in the crashed vehicle.  Tr. 80.[4]

40. Green did not invoke his right to silence or his right to counsel.  *Berghuis*, 560 U.S. at 382 (defendant "did not say that he wanted to remain silent or that he did not want to talk with the police").

41. Even assuming, arguendo, Green did not initially cooperate with officers about whose drugs were found at the crash scene, that lack of cooperation would not prevent the FBI

---

[4] Green, after executing the Advice of Rights form, admitted the drugs belonged to him.  Tr. 38.

agents from asking him questions about his willingness to answer questions on other topics,

such as the overdose death. *See* Tr. 84 (Green testified Balish was interested in the

overdose death, not the drugs in the silver Lincoln).

42. In *United States v. Rought*, 11 F.4th 178 (3d Cir. 2021), the court explained that an

invocation of rights can be limited by topic or subject matter.  *Id.* at 188.  The court held :

> After a limited invocation, interrogation can continue on topics not covered by the
> invocation.  If the suspect, without prompting from law enforcement, then
> voluntarily reinitiates discussion of a covered topic and waives [his] previously
> invoked rights, it "is quite consistent with the Fifth Amendment" for the suspect's
> statements about a covered topic to be admissible at trial.

*Id.* at 183.

43. There is no evidence in this record that Orlando or Balish knew about Green's initial

alleged refusal to cooperate.  To reiterate, defense counsel's assertions that the FBI agents

knew that Green invoked his *Miranda* rights and questioned him anyway (*see* Defendant's

proposed findings ¶¶ 29, 30, 31), are not supported by the record.  In addition, absent an

unlimited invocation of rights, any refusal by Green to talk about the drugs in the silver

Lincoln would not have barred the agents from asking Green questions about the overdose

death.

44. There is no evidence of a clear invocation of rights by Green that would bar the FBI agents

from asking Green whether he was willing to waive his *Miranda* rights.

### C.  Green's waiver of his *Miranda* Rights

45. A defendant may waive his *Miranda* rights if the waiver is knowingly, intelligently, and

voluntarily made. *Miranda*, 384 U.S. at 444.

46. The government has the burden of proving, by a preponderance of the evidence, that

waivers of *Miranda* rights during an interview were knowing and voluntary. *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)); *United States v. Kramer*, No. 3:20-CR-147, 2021 WL 1517845, at *3 (M.D. Pa. Apr. 16, 2021).

47. Two factors affect this determination:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A court may properly conclude that the *Miranda* rights have been waived only if the totality of the circumstances surrounding the interrogation reveal both: (1) an uncoerced choice; and (2) the requisite level of comprehension.  *Id.*

48. Factors to be considered include the suspect's background and experience, prior dealings with the criminal justice system, age, education, intelligence, the advice of constitutional rights, the length of detention, whether questioning was repeated and prolonged, and the use of physical punishment such as the deprivation of food or sleep.  *United States v. Spruill*, No. CRIM.A. 05-CR-532, 2006 WL 1340615, at *3 (E.D. Pa. May 12, 2006), aff'd, 373 F. App'x 318 (3d Cir. 2010).[5]

49. Green signed a written Advice of Rights form, consenting to waive his *Miranda* rights.

50. A signed waiver form is "strong proof" of the validity of Green's waiver.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that

---

[5] The parties did not introduce evidence about several of these factors.

waiver, but is not inevitably either necessary or sufficient to establish waiver.").

51. An overarching circumstance in this case is that Green admittedly signed <u>two</u> consent forms: (1) the Advice of Rights form; and (2) the consent to search his cell phone (Ex. 2, 3). Green testified that his consent to search the cell phone, which occurred later in the interview, was voluntary. Tr. 94, 101. It is difficult to reconcile his concession that he knowingly and voluntarily permitted the agents to download the contents of his cell phone (which may have contained evidence of drug dealing, *see* Tr. 101), with his argument that he did not agree to answer questions.

    i. <u>Green's waiver was voluntary</u>

52. The evidence adduced does not support Green's argument that the agents coerced Green to sign the Advice of Rights form or forced him to continue the interview against his will.

53. The waiver occurred early in the interview process, prior to Orlando's discussion of Green's options. The waiver was not the product of a lengthy interrogation or sleep deprivation. The controlled drug purchase by the CS occurred around 5:00 p.m. The crash involving the silver Lincoln occurred around 5:30 p.m. Green estimated that he was in the FBI interview room with Balish for 30-45 minutes before the interview started. Tr. 82. The Advice of Rights form was signed at 7:28 p.m. Orlando estimated the interview lasted 30-45 minutes in the van outside. Tr. 54. Orlando estimated the total time Green was at the FBI location – in the building or the van -- was an hour or hour and a half, Tr. 32, and the total time period from the vehicle crash until Green was dropped off to meet his girlfriend was approximately 3 hours. Tr. 44.

54. Most of Green's statements were made in the minivan, when he was no longer handcuffed.

55. Green demonstrably knew how to invoke his rights and assert objections. Green, in fact,

objected twice: (1) he requested to terminate the recording; and (2) he asked to conduct the interview in a different location outside the FBI building. In each instance, the agents complied with Green's requests.

56. The facts that Green likely faced criminal charges and detention if he refused to cooperate and that Orlando presented Green with unpleasant options does not make his waiver of rights non-voluntary. *United States v. Falciglia*, 421 F. App'x 146, 147 (3d Cir. 2008) ("an officer may indicate that the defendant's statements could bring about leniency without violating *Miranda*."); *United States v. Briggs*, No. CR 06-715-1, 2008 WL 1745661, at *9 (E.D. Pa. Apr. 14, 2008), aff'd, 347 F. App'x 750 (3d Cir. 2009) (statements that: (1) defendant could go home if he told officers something and (2) that he was looking at 40-some years if he did not cooperate, if made, "were within the limits of proper interrogation techniques").

57. As explained in *Briggs*:

> [A]lthough it is possible to find involuntariness based on psychological coercion, "it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." *Miller v. Fenton,* 796 F.2d 598, 603-05 (3d Cir. 1986). "The question to be answered when such tactics are used is whether they 'were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.' " *United States v. Griggie,* 105 Fed. App'x 431, 435 (3d Cir. 2004) (citing *Miller,* 796 F.2d at 605). An investigator may "play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state." *Miller,* 796 F.2d at 605 (citing *Rachlin v. United States,* 723 F.2d 1373, 1378 (8th Cir. 1983); *United States v. Vera,* 701 F.2d 1349, 1363-64 (11th Cir. 1983)).

*Briggs*, 2008 WL 1745661 at *16.

58. Green testified that Balish, prior to Orlando's entry into the interview room, told Green that he was in trouble, facing 20 years and may not see his wife and child if he did not cooperate. Tr. 82-83. These statements were not credited by the court. It was uncontested

that Orlando, not Balish, acted as the lead interviewer.  Green testified that when he asked

Balish if he could make a phone call, Balish deferred the decision to Orlando, and when

Green asked Balish whether he was going home or to jail, Balish brushed him off and did

not answer. Tr. 83, 88.  In evaluating Green's credibility, the court considered that Green's

testimony on this point was inconsistent, i.e., Green testified that both agents threatened he

would never see his child, but also testified that the agents did not say that; rather, it was

how he felt.  Tr. 93, 102.

59. Even if this testimony by Green was credited by the court, the statements attributed to

Balish by Green were within proper law enforcement tactics. *Briggs*, 2008 WL 1745661,

at *9.

60. In sum, the court finds that Green's will was not overborne and his waiver of his *Miranda*

rights was voluntary.

     ii. Green's waiver was knowing and intelligent

61. There is no evidence of a lack of comprehension by Green.  Green, in fact, testified that he

told the agents he understood his rights.  Tr. 87.

62. The court observed Green's demeanor and testimony during the suppression hearing.  It is

clear that Green is competent and understands English.  Green also testified credibly that he

read and comprehended Orlando's FBI report, which is written in English, and challenged

the accuracy of some of the statements contained in it.  Tr. 89-91.  There is no evidence

that Green suffers from diminished mental capacity.

63. The court finds Orlando's and Balish's testimony that Green was informed of his rights

verbally, had an opportunity to read the written Advice of Rights form, and willingly

signed the Advice of Rights form to be credible.

64. The court does not credit Green's testimony that the Advice of Rights form was not read to him, Tr. 87, or that he signed it without reading it or paying attention to it, Tr. 86-87, 97-98.

65. Even assuming, arguendo, that Green signed the Advice of Rights form without paying attention or reading it, that failure to read does not justify suppression of his statements. Here, the agents read Green his *Miranda* rights aloud and Green acknowledged he understood them.  Even if he had not signed the Advice of Rights form, that would have been sufficient.  *United States v. Vega-Arizmendi*, No. CR 2016-0009-13, 2017 WL 132844, at *8-9 (D.V.I. Jan. 12, 2017) (despite the assertion that the defendant was not paying attention and did not understand the written forms, waiver valid where officers read the *Miranda* form to him and the defendant verbally affirmed he understood his rights) (citing *Berghuis*, 560 U.S. at 385).

66. In summary, under the totality of the circumstances adduced at the hearing, Green's waiver of his *Miranda* rights was knowing and voluntary.


### **D.   Green's conduct during the interview**

    (i)    Right to an attorney

67. To the extent Green is arguing he invoked his right to an attorney, that argument is not supported by the record.

68. In *Davis,* the Supreme Court held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect <u>clearly</u> requests an attorney." *Davis*, 512 U.S. at 461 (emphasis added).  Equivocal or ambiguous requests will not suffice.  *Id.* at 459.

69. Green conceded that he never specifically asked for an attorney.  Tr. 87

70. Under the totality of the facts and circumstances of this case, Green's request to make a

    phone call was not a clear, unequivocal assertion of his right to counsel because Green

    never told the agents who he wanted to call.  Tr. 87-89.  The agents, therefore, were not

    required to cease questioning Green.

   (ii) Right to remain silent

71. To the extent Green is arguing he invoked his right to silence, that argument is not

    supported by the record.

72. Green did not refuse to answer questions, but instead engaged in a productive discussion

    with the FBI agents.  The agents' satisfaction with Green's cooperation is reflected by their

    willingness to drive him to meet his girlfriend after the interview.

73. In light of these conclusions, the court does not credit Green's testimony that he was

    exhausted, kept denying the allegations, felt forced to talk, responded to Orlando's

    questions by saying "whatever you say" and demanded at least ten times to be taken to jail

    or home.  Tr. 86, 92.  Green asked for the recording to be stopped and asked to move the

    conversation to another location (i.e., the minivan).  The court also does not credit Green's

    testimony that he told the agents "I have nothing to say to neither one of you guys."  Tr.

    103.

74. Even if Green's answers to questions were evasive, unhelpful, or he simply said

    "whatever," those responses do not constitute a clear, unequivocal assertion of his right to

    remain silent.  *See Berghuis*, 560 U.S. at 370 (remaining silent for the first 2 hours and 45

    minutes of an interview did not constitute invocation of right to silence).  Any reluctance or

    evasiveness on his part would not arise to the level where agents would have been required

to cease questioning him.

75. Green argues that he invoked his *Miranda* rights when he refused to consent to the interview being recorded and when he asked to continue the interview outside the FBI building.  Those limited objections – particularly when viewed in light of his contemporaneous execution of the Advice of Rights form waiving his *Miranda* rights – were insufficient to require the FBI agents to cease their questioning.  *Davis*, 512 US at 459.  Indeed, Green's requests to stop the recording and meet in another location are consistent with the conclusion he waived his right to remain silent and wanted to cooperate, i.e., cooperating witnesses frequently do not want to be recorded.  Tr. 67.

V.     <u>Conclusion</u>

After careful consideration of the record and relevant legal authorities, the court concludes that the motion to suppress evidence filed by Green (ECF No. 66) will be DENIED.  This conclusion does not prevent Green from arguing, at trial, that the agents misunderstood or misrepresented his actual statements during the interview or as recorded in Orlando's report.  The court will set a telephone status conference for February 28, 2022, at 12:30 p.m., to discuss the procedural status of this case.

An appropriate order will be entered.

February 25, 2022

BY THE COURT:

<u>/s/ *Joy Flowers Conti*</u>
Joy Flowers Conti
Senior United States District Judge